JIM CLIFTON, WILLIAM RAMIREZ
and ANGELO RICH, JR.,

     **Plaintiffs,**

vs.                                   **No. CIV 99-372 MV/DJS**

HOLMES & NARVER, INC.,
     **Defendant.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Holmes & Narver's Motion for Summary Judgment Regarding Retaliatory Discharge, filed March 27, 2000 **[Doc. No. 66]** and Motion for Summary Judgment On Plaintiffs' Claim for Punitive Damages Under the New Mexico Human Rights Act and for Compensatory, Punitive and Liquidated Damages Under the Age Discrimination in Employment Act, filed March 27, 2000 **[Doc. No. 70]**.  The Court, having considered the motions, responses, replies, relevant law, and being otherwise fully informed, finds that the Motion for Summary Judgment Regarding Retaliatory Discharge is well taken in part and will be **GRANTED IN PART** and **DENIED IN PART**.  The Court further finds that the Motion for Summary Judgment On Plaintiffs' Claim for Punitive Damages Under the New Mexico Human Rights Act and for Compensatory, Punitive and Liquidated Damages Under the Age Discrimination in Employment Act is well taken in part and will be **GRANTED IN PART** and **DENIED IN PART**, as explained below.

# FACTUAL BACKGROUND

The Court finds the following material facts to be undisputed:[1] Plaintiffs Jim Clifton, William Ramirez and Angelo Rich, Jr. assert claims for age discrimination under the Age Discrimination in Employment Act (ADEA) and the New Mexico Human Rights Act, as well as claims for retaliatory discharge. Plaintiffs were employed by Defendant Holmes & Narver as construction observers at the Sandia National Laboratories (hereinafter "Sandia") facilities in Albuquerque, New Mexico. Plaintiffs performed inspection services on various federal construction contracts underway at Sandia. Plaintiffs were the three oldest employees who were working for Holmes & Narver on the Sandia contract. Two of the Plaintiffs were the only employees in their sixties, while the other Plaintiff was at the time of his employment, in his late fifties. Plaintiffs each had many years of experience in their respective disciplines and were considered by many to be the best qualified construction inspectors at Holmes & Narver in terms of training, knowledge and years of experience. Plaintiff Jim Clifton worked as a certified electrical inspector, Plaintiff William Ramirez worked as a certified mechanical inspector, and Plaintiff Angelo Ramirez was a certified building inspector.

On or about March 29, 1996 Defendant terminated Plaintiffs' employment as part of a reduction in workforce requested by Sandia. Defendant retained younger, and according to Plaintiffs, less qualified inspectors to perform the same or similar work for Sandia. As justification for the terminations, Defendant contends that (1) Sandia, rather than Defendants, had

---

[1]    The Court accepts as undisputed all facts admitted by both parties and all facts for which no competent contrary evidence has been presented by the opposing party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). Mere assertions that a fact is or is not controverted are insufficient. *Id.*

control over who was laid off; (2) despite Plaintiffs' experience and qualifications, the retained employees had qualifications better suited to Sandia's needs; and (3) Plaintiffs were selected for layoff because their departure would create the least disruption in the ongoing projects at Sandia. With regard to the Plaintiffs' qualifications Defendant specifically asserts that Plaintiff William Ramirez did not have the experience necessary to work on a new HVAC system being installed at Sandia; Plaintiff Angelo Rich was qualified as an architectural inspector, but was less qualified as a civil or structural inspector; and Plaintiff Jim Clifton did not want to work weekends or overtime.

The evidence offered by Plaintiffs contradicts Defendant's proffered justifications. Indeed the evidence suggests that Plaintiffs were the most qualified Holmes & Narver employees in terms of experience, knowledge and training. Plaintiff Ramirez asserts that his qualifications to work on the HVAC system were never addressed as an issue until after he filed his EEOC complaint. In addition, there is evidence demonstrating that Plaintiff Rich was at least as qualified a civil and structural engineer as his retained co-workers. The evidence also shows that Jim Clifton had among the heaviest workloads and was willing to work overtime to meet his various responsibilities.

In addition, it is clear that although Sandia retained through their contract with Holmes & Narver the final decision making authority in termination decisions, they did not exercise this authority in the layoffs of Plaintiffs. In mid-January of 1996, Sandia told Defendant that the overall work load would be cut back and some employees would be laid off. Allen Nichelson was the senior project manager employed by Holmes & Narver who administrated the contract between Sandia and Holmes and Narver. Nichelsen, along with David Corbett, a Sandia project

3

manager, met to discuss who would be removed from the Sandia contract. Corbett informed Nichelsen of Sandia's critical needs and project priorities. Corbett did not specify which employees should be retained or terminated. According to Corbett, Sandia would have been satisfied with retaining a number of different employees and did not request the termination of Plaintiffs. Rather, Sandia let Holmes & Narver make the final layoff decisions.

The evidence further demonstrates that disruption in Sandia projects was frequent and inevitable. Plaintiffs had among the heavier workloads of all inspectors at Holmes & Narver. As such their departure would result in more, rather than less, disruption since their workloads would need to be reassigned. Although Sandia wanted to avoid project disruption, they were aware that some disruption would inevitably occur. Sandia was prepared to face some disruption and routinely changed assignments among the workers.

At the time of the layoffs, Holmes & Narver was aware that their three oldest employees were being terminated. During a discussion about the Plaintiffs, Nichelsen acknowledged that the Plaintiffs were close to retirement age and asserted that Plaintiffs could not sue Holmes & Narver. Rita Shiplet, the Human Resources Manager for the Albuquerque Division of Holmes & Narver, had noticed a disproportionate number of older employees being laid off. She expressed concern regarding the Plaintiffs' ages to the corporate human resources manager and the in-house counsel. According to Shiplet, no corrective action was taken because she eventually determined that there was no reason to suspect discrimination. In addition, Defendant did not conform with its corporate policy which sets forth the specific actions to be taken when potential discrimination is identified.

In addition to age discrimination, Plaintiffs also allege they were discharged in retaliation

for their strict compliance with safety protocol.  Over the years of their employment with Holmes & Narver, the Plaintiffs earned reputations as vigilant construction observers who demanded high performance and strict adherence to safety regulations.  Plaintiffs allege several different instances in which they were pressured to be more lenient in approving construction projects.  Specifically, Plaintiff Jim Clifton alleges that he was pressured by Sandia to:

1.  Approve a toxic gas alarm where the safety code was not met.  Clifton refused to give his approval.

2.  Approve of contract price increases even though the matters were already adequately included in the pre-contact blueprints.

3.  Approve a lighting system improperly installed.  The lighting system was steel, but its specifications called for brass.  This discrepancy would cause the system to malfunction if it was hit by lightening.

4.  Certify an electrical mat that did not meet safety standards.  Clifton refused to certify the mat.

5.  Not approve of overtime that the employees were legally entitled to.  Clifton asked a contractor to work overtime.  The contractor was denied overtime pay by a different supervisor.  After some negotiation the contractor received compensatory time in lieu of overtime.  This supervisor later gave Clifton an unfavorable annual review in 1988.  This review was later revised.

6.  Proceed with construction despite a dangerous, high-voltage electrical current running through lines.  Clifton requested that Sandia's electrical line department confirm that no current was running through a line where the contractor was

supposed to work.  Sandia's electrical department wrongly stated that no electrical current was running through the line.  An electrical pole then exploded.

Clifton has no personal knowledge whether Holmes & Narver was informed by Sandia of these incidents.  However, after these incidents, Clifton was subject to criticism by his supervisors at Holmes & Narver.  Specifically, Clifton was instructed in his annual reviews, monthly meetings and in office visits to "get along better with contractors," "be more of a team player" and was told he was not effective at dealing with people.  There is nothing in his performance record outside of these incidents which would give rise to such criticism.  He believes these comments are a direct result of his vigilant oversight.

Plaintiff William Ramirez was pressured by Sandia to:

1.      Give approval to a construction project, even though the fire protection system could not be verified because the plans were missing.  Ramirez had an ongoing dispute with a Sandia supervisor, Valerie Roberts, over the incident.  He was terminated before the plans were located and the building's safety was certified.

2.      Certify that work was complete so that contractors could be paid in full, even though the work was unfinished.  Ramirez did certify for Sandia that the work was complete.

3.      In 1994, two years prior to his termination, Ramirez was compelled over his objections to sign off on a final billing for a set of chillers that did not work properly and did not meet specification.

4.      Ramirez along with Plaintiff Rich was asked to render an opinion about whether a heavy crane was safe.  The crane had bald tires, cracked windshields and mirrors.

Neither Ramirez or Rich were responsible for certifying the safety of the crane.

The crane inspector certified the crane as safe.

Ramirez has no knowledge of these incidents being reported by Sandia to Holmes & Narver. There is no evidence that he was subject to any negative performance reviews based upon these incidents. He believes however, that these incidents became a part of his "unwritten track record."

Plaintiff Angelo Rich was pressured by Sandia to:

1.      Allow contractors to work on dangerous scaffolding.

He also has no knowledge of whether this incident was reported to Holmes & Narver and did not suffer any adverse employment reviews.

## LEGAL STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure, which are intended to "'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed.R.Civ.P. 1). Under Rule 56(c), summary judgment is appropriate when the Court, viewing the record in the light most favorable to the non-moving party, determines that "there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Thrasher v. B&B Chemical Co.*, 2 F.3d 995, 996 (10th Cir. 1993). The movant bears the initial burden of showing "there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). Once the movant meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions,

answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the material submitted by the parties in support of and in opposition to the motion must be construed liberally in favor of the party opposing the motion, *Harsha v. United States*, 590 F.2d 884, 887 (10th Cir. 1979), the burden on the moving party may be discharged by demonstrating to the district court that there is an absence of evidence to support the nonmoving party's case. *Celotex*, 477 U.S. at 325. In such a situation, the moving party is entitled to judgment as a matter of law, "because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* at 322.

## DISCUSSION

### A.    Retaliatory Discharge Claim

Plaintiffs claim they were retaliated against for their strict compliance with safety standards. New Mexico recognizes the tort of retaliatory discharge in cases where an employee is discharged for engaging in an act favored by public policy. *See Vigil v. Arzola,* 102 N.M. 682, 689 (Ct. App. 1983), *rev'd in part on other grounds*, 101 N.M. 687 (1994), o*verruled in part on other grounds, Chavez v. Manville Products Corp.*, 108 N.M. 643 (1989). In order to establish a claim for retaliatory discharge under New Mexico law, Plaintiffs need to (1) prove that they engaged in an act that public policy could encourage ("protected act"), and (2) establish a causal connection between their actions and subsequent discharge. *See Shovelin v. Central N.M. Elec.*

*Co-Op*, 115 N.M. 293 (1993).

For the purpose of this motion, Defendant does not dispute that Plaintiffs were engaged in activities favored by public policy - that being the enforcement of safety regulations and labor standards. *See Marx v. Schnuck Markets,* 76 F.3d 324 (10th Cir. 1996) (retaliation for employee conduct protected by FLSA); *Weidler v. Big J. Enterprises, Inc.*, 124 N.M. 591 (Ct. App. 1997) (retaliation against construction worker who reported unsafe handling of sulfuric acid). Rather, Defendant contends that Plaintiffs have failed to prove a causal connection between the protected activities engage in by Plaintiffs and their subsequent discharge.

In establishing causation, Plaintiffs must show that a sufficient nexus exists between the public policy asserted by the employee and the reasons for the discharge. *Vigil v. Arzola,* 102 N.M. at 689. Plaintiffs "need not establish the employer's actual knowledge" that the Plaintiffs engaged in protected activity. *See Comments to UJI 13-2304.* Rather, "a discharge based on the employer's belief or suspicion that the plaintiff engaged in protected activity is wrongful." *Id.* "Clearly, 'an employer cannot fire an employee for actions of which the employer is unaware.'" *Weidler v. Big J Enterprises,* 124 N.M. at 599. There must be some evidence "that the employer was aware, either by suspicion or actual knowledge, of the protected activity." *Id.* An employee fails to establish the causal connection necessary to sustain a claim for retaliatory discharge when there is no evidence that the persons responsible for the discharge had any knowledge that the employee engaged in an activity alleged to be protected. *See Lihosit v. I & W, Inc.,* 121 N.M. 455 (Ct. App. 1996).

The employer's motive is a key element of retaliatory discharges. The Plaintiffs must establish that the termination was motivated by the protected activity. *See Weidler v. Big J.*

*Enterprises*, 124 N.M. at 599. Under New Mexico law, the retaliatory reason for the discharge "need not be the only reason, nor the last, nor the latest reason for the discharge." *NM UJI* 12-2304. Instead, Plaintiffs need only establish by a preponderance of the evidence that the protected conduct was "a motivating factor in the discharge." *Id.* Direct evidence of an employer's motive is not required, as an employer will rarely admit to a retaliatory intent. *See Weidler v. Big J. Enterprises,* 124 N.M. at 600. An employer's retaliatory intent may be inferred from the surrounding circumstances and indirect evidence. Such indirect evidence tending to prove a retaliatory intent includes (1) evidence that the stated reason for termination is a mere pretext; (2) evidence of differential treatment in the workplace; (3) a retaliatory mindset; and (4) a pattern of retaliatory conduct. *See Marx v. Schnuck Markets,* 76 F.3d 324 (employee was subject to a pattern of retaliatory conduct after filing a FLSA complaint, even though actual termination was not until years later); *O'Neal v. Ferguson Construction Co.*, 35 F. Supp.2d 832, 834 (D.N.M. 1999) (pattern of retaliatory adverse employment actions established a causal connection); *Weidler v. Big J. Enterprises*, 124 N.M. 591 (pretext for retaliatory discharge found where employee was given good evaluations, but was terminated after reporting safety concern and where employer had a pattern of hostility to reports of safety concerns); *Harrison v. Metropolitan Gov't of Nashville and Davidson County*, 80 F.3d 1107, 1118-19 (6th Cir. 1996) (evidence of an atmosphere in which plaintiff's activities were scrutinized more carefully than those of other employees and defendant tried to make plaintiff's life as an employee difficult supports a finding of retaliation); *Dominic v. Consolidated Edison Co.* , 822 F.2d 1249, 1254-55 (2nd Cir., 1987) (retaliation shown where defendant retroactively altered plaintiff's performance rating, transferred plaintiff, and assigned work that was impossible to complete); *Hutchins v. A.G. Edwards & Sons.*

978 F. Supp. 885 (E.D. Mo. 1997) (statement of defendant evidencing its awareness of plaintiff's lawsuit at the time of termination supports a finding of retaliation). Retaliatory conduct can include such adverse employment actions as reducing an employee's workload, assigning menial tasks outside of the scope of employment, altering an employee's hours, transferring an employee, or giving negative employee reviews. *See Conner v. Schnuck Markets, Inc*., 121 F.3d 1390, 1395 (10th Cir,. 1997); *Marx v. Schnuck Markets, Inc., 7*6 F.3d at 329; *O'Neal v. Ferguson*, 35 F. Supp. 2d at 835.

Temporality of retaliatory conduct is a key element in establishing that the employer's actions were motivated by retaliation. The Tenth Circuit has found that causation could be proved by showing a temporal proximity between the protected act and the retaliatory conduct. For example, in *Richmond v. ONEOK*, the Tenth Circuit found that a "three month period between the activity and the termination, standing alone, does not establish a causal connection." *Richmond v. ONEOK, Inc*. 120 F.3d 205, 209 (10th Cir. 1997). Where temporal proximity between the protected act and the termination is lacking, causation may be proved by additional evidence, such as a pattern of retaliatory treatment in the workplace. *See Connor v. Shnuck Markets*, 121 F.3d 1390. "While retaliatory intent may be inferred from adverse reaction which 'closely followed' [a] plaintiff's protected activity, 'the phrase closely followed' must not be read too restrictively where *the pattern of retaliatory conduct* begins soon after the [protected activity] and only culminates later in a discharge. *Id. quoting Marx v. Schnuck Markets, Inc.* 76 F.3d at 329 (emphasis in original).

Applying these principles to the present case, the Court finds that Plaintiff Jim Clifton has established a causal connection between the protected acts and his termination, while Plaintiff

William Ramirez and Plaintiff Angelo Rich have not established a causal connection. Jim Clifton engaged in several protected acts, including most relevantly (1) refusal to approve a toxic gas alarm where the safety code was not met; (2) refusal to approve of light system that was improperly installed; (3) refusal to certify a hazardous electrical mat; (4) refusal to proceed with construction without first verifying that a dangerous, high-voltage electrical current was not running through lines; and (5) advocating for overtime pay for employees who were legally entitled. Although Clifton has no personal knowledge that Holmes & Narver was informed of these protected acts, there is sufficient indirect evidence suggesting that Defendant knew of these acts and retaliated against Clifton. The temporal proximity between the protected acts, which occurred over a ten year period, and Clifton's ultimate termination in 1996 does not, by itself, support a causal connection. Despite this lack of temporality, there is evidence that Holmes & Narver engaged in retaliatory adverse employment actions as a result of these protected acts. Specifically, after each of these instances, Clifton was instructed either in monthly meetings, written evaluations, or office visits to be more cooperative and to get along better with contractors. In one instance, where he advocated for an employee to get overtime pay, Clifton received a negative review which was later revised. In another instance, Clifton was told by a Sandia supervisor that he was being overzealous in enforcing the safety regulations. Afterwards, Clifton was again told by Holmes & Narver to work better with contractors. There is no other evidence before the Court, aside from the protected acts engaged in by Clifton, which would prompt Defendant to criticize Clifton on his job performance. There is also evidence suggesting that the justifications offered by Defendant for Clifton's termination was mere pretext. Defendant argues that Clifton was terminated because he did not want to work overtime and because his

departure would cause minimal disruption.  Both these justifications are contradicted by the facts.  Clifton's deposition testimony makes clear that he was willing to work overtime and had never suggested otherwise to Defendant.  Furthermore, Clifton had among the highest workload of any inspector, thus his departure and the reassignment of his projects would cause much disruption.  The facts asserted by Clifton support his claim that Holmes & Narver terminated him out of a retaliatory motive.   Most relevantly, Clifton was subject to adverse employment reviews following his protected activity - thus giving rise to an inference that Defendant both knew of and disapproved of Clifton's protected activities.  This knowledge, coupled with the pretextual justifications for Clifton's termination support a finding of retaliatory motive.

There is insufficient evidence, however, to support a causal connection that Plaintiff William Ramirez was retaliated against for engaging in a protected act.  The protected acts alleged by Ramirez include (1) disapproval of a damaged heavy crane; (2) refusal to certify a building without the required fire safety plans; and (3) reluctance to sign off on a chiller that was not completed and did not meet specifications.  There is no evidence that Holmes & Narver was aware of either of these incidents or took any action in response.  With respect to the first incident, the disapproval of the crane, Ramirez, along with Plaintiff Rich, rendered an opinion that the crane was unsafe due to bald tires and broken mirrors.  Ramirez was not a crane inspector, but merely was offering a solicited opinion.  The crane inspector ultimately proved the safety of the crane.  This incident took place in 1994, thus there is no temporal proximity to his 1996 termination.  Furthermore, Homes & Narver never addressed this incident or took any action in response to this incident.  The second incident, his reluctance to sign off on a chiller, also occurred two years prior to his termination and was never addressed by Holmes & Narver.  Aside

from his 1996 termination, Ramirez can point to no adverse employment action which would suggest retaliation. He merely speculates that these two incident became a part of his "unwritten track record." The most significant incident occurred immediately prior to his termination, in which Ramirez engaged in a series of heated discussions with Sandia supervisor Valerie Roberts, concerning his refusal to certify a building without first reviewing the fire safety plans. After Valerie Roberts was transferred to a different location, her Sandia replacement Dave Hendrix displayed a hostile attitude towards Ramirez, suggesting that he was aware of the protected act and disapproved. However, there is no evidence to suggest that this incident was ever communicated by the Sandia supervisors to Holmes & Narver. Ramirez was terminated before he reviewed the fire safety plans and before the building was certified. Although, the temporal proximity of the incident to his termination would support a causal connection, without any evidence of knowledge on the part of Holmes & Narver, there can be no finding of a retaliatory motive. *See Lihosit v. I & W, Inc.,* 121 N.M. 455.

Likewise, Plaintiff Angelo Rich has failed to meet his burden of establishing a causal connection between the protected acts and his termination. The only protected acts cited by Rich is his refusal to allow employees to work on a dangerous scaffolding and his disapproval of a damaged heavy crane. There is no evidence that either of these incidents were ever communicated to Holmes & Narver. There is also no temporal proximity between these events and Rich's termination. In fact, the evidence does not specify when these events occurred, aside from somewhere between 1990 and 1996. The only other employment action, aside from his termination, which Rich cites to is an annual review where he was instructed to "[c]ontinue to share with others and strive to be a team play and a mentor." This review appears to the Court to

be quite ambiguous and not necessarily adverse. Even viewing this statement in the light most favorable to Plaintiff, this review appears at best to be constructive criticism. Based upon this lack of employer knowledge, lack of temporal proximity, and absence of a pattern of retaliatory conduct, the Court finds that Plaintiff Rich has failed to meet his burden of proving a causal connection between his protected acts and his termination.

The fundamental flaw in Plaintiff Ramirez's and Plaintiff Rich's claims is that there is no evidence that Holmes & Narver was aware that the Plaintiffs were engaged in protected activities. Rather, the protected activities took place at Sandia, under the supervision of Sandia contractors. Plaintiffs argue that Holmes & Narver had a retaliatory mindset, as evidenced by the fact that Holmes & Narver had a pattern of terminating the inspectors who had reputations for strict standards. Specifically six of the eight contractors with strict reputations have been terminated, while five of the six contractors with lenient reputations are still employed. Plaintiffs were among the contractors with these strict reputations who were terminated. Notwithstanding Plaintiffs' reputations, there is simply no evidence that Holmes & Narver retaliated against them for engaging in protected activities. The alleged protected acts took place over the course of Rich's and Ramirez's tenure at Sandia. There is no indication that Holmes & Narver had concerns about Plaintiffs strict inspection practices, or ever addressed the strict reputations with Plaintiffs Rich and Ramirez. Plaintiffs argue that the retaliatory motive is clear from Holmes & Narver's pretextual justifications for the terminations. According to Holmes & Narver, the Plaintiffs were terminated because of a lack in *qualifications and in order to avoid disruption. As discussed in more detail in Section B,* infra, both these justifications are contradicted by the evidence which demonstrates that Plaintiffs Rich and Ramirez were among the most qualified inspectors, and that

disruption was commonplace at Sandia. Although there is evidence of pretext in this case, there is nothing to suggest that the pretext was a cover for retaliatory discharge. Pretext by itself, without evidence suggesting that the employer had knowledge of the employee's protected acts, cannot support a finding of retaliatory motive. Rather, the evidence more strongly indicates that the pretext was to cover age discrimination. Without any awareness or suspicion on the part of Holmes & Narver that Rich and Ramirez were engaging in protected activities, there is no causal connection between the protected activities and the termination. *See Lihosit v. I & W, Inc.,* 121 N.M. 455.

### B. Liquidated Damages Under the ADEA

Defendant also moves for summary judgment on Plaintiff's claim for punitive damages, compensatory damages, and liquidated damages under the ADEA and punitive damages under the New Mexico Human Rights Act. Plaintiffs concur that they cannot recover punitive or compensatory damages under the ADEA or punitive damages under the New Mexico Human Rights Act. It is agreed, however, that compensatory damages are available under the New Mexico Human Rights Act, and both compensatory and punitive damages are available under the claim for retaliatory discharge. *See Rhein v. ADT Automotive, Inc.* 122 N.M. 646, 654 (1996); *Behrmann v. Phototran Corp.*, 110 N.M. 323 (1995); *Chavez v. Manville Products Corp.*, 108 N.M. 643 (1989). The sole issue in dispute before the Court is whether Plaintiffs have offered sufficient facts to support a claim for liquidated damages under the ADEA.

Significantly, Defendant does not move for summary judgment on Plaintiffs ADEA claims. As such, the Court need not ascertain whether Plaintiffs have presented a prima facie case of age

discrimination under the ADEA. Rather, Defendant asks the Court to find as a matter of law that Plaintiffs have not presented evidence to support an award of liquidated damages under the ADEA. Liquidated damages - which are punitive in nature - are recoverable under the ADEA only in cases of willful violations of the Act. *See* 29 U.S.C. § 626(b); *Hazen Paper Co. v. Biggins*, 507 U.S. 604 (1993). An employer's actions are willful only where "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute..." *Hazen Paper Co. v. Buggins,* 507 U.S. at 617. If an employer acts non-recklessly and in good faith in attempting to determine whether its actions would violate the ADEA, an award of liquidated damages is not warranted. In order to impose liquidated damages under the ADEA for a "willful" violation of the Act, a plaintiff must show something more than mere knowledge on the part of the employer of the potential applicability of the ADEA. Rather, under Tenth Circuit law, a plaintiff must show that age was a "predominate factor in the employer's decision." *Cooper v. Asplundh Tree Expert Co*., 836 F.2d 1544, 1551 (10th Cir. 1988). A willful violation of the ADEA can be proved by demonstrating a pattern of discrimination, discriminatory statements made by supervisors, or pretextual justifications for termination. *See Spulak v. K Mart*, 894 F.2d 1150, 1159 (10th Cir. 1990) (sufficient evidence that age was a "predominant factor" for termination where employer's justifications were pretextual); *Anderson v. Phillips Petroleum Co*., 861 F.2d 631 (10th Cir. 1988) (no willful violation where employer offered legitimate nondiscriminatory reason for termination); *Cooper v. Asplundh Tree Expert,* 836 F.2d 1544 (10th Cir. 1988) (willful violation found where management made age discriminatory statement and employer's justifications for termination were shown to be pretextual); *Furr v. AT&T Technologies*, 824 F.2d 1537 (10th Cir. 1987) (willful violation found where employer

demonstrated overall pattern of age discrimination, and management made derogatory statements about employee's age).

Defendant argues that this case is analogous to *TWA v. Thurston*, where the Supreme Court found that TWA was not acting willfully when it adopted a retirement policy in an attempt to conform to an ADEA amendment prohibiting mandatory retirement based upon age. *TWA v. Thurston,* 469 U.S. 111 (1985). The policy allowed any employee in "flight engineer status" at age 60 to continue working in that capacity, but failed to give 60 year old captains the right automatically to train as flight engineers. The Court held that TWA's conduct in adopting the policy was not willful because TWA did not "know" that its conduct violated the ADEA or act in reckless disregard of the ADEA. Rather, the Court determined that TWA had acted in good faith in attempting to bring its retirement policy into compliance with the ADEA while negotiating within the confines of a collective bargaining agreement. Defendant in this case asserts that, like TWA, Holmes & Narver was acting in good faith by attempting to adhere to their unique contract with Sandia, which gave Sandia unfettered discretion in deciding which Holmes & Narver employees to retain on its projects. Defendant concedes that it was aware of the ADEA implications due to Plaintiffs' ages and consulted with in-house counsel and the corporate Human Resources manager to determine if any corrective action was necessary. Defendant asserts however that it did not willfully discrimination against Plaintiffs because (1) the termination decision was made by Sandia, rather than Holmes & Narver; (2) the termination was justified by the individuals qualifications; and (3) Plaintiffs were termination to minimize disruption of Sandia projects.

The Court is not persuaded by Defendant's arguments. While Defendant was certainly

aware of the ADEA implications of terminating the Plaintiffs, it does not appear to the Court that they were particularly troubled by the possibility of age discrimination. Rather, the evidence indicates that despite the ADEA implications, Defendant acted willfully or recklessly in terminating its three oldest employees.

Based on the evidence before the Court, the justifications offered by Defendant for the terminations appear to be pretextual. As an initial matter, Defendant attempts to lay blame for the termination decisions on Sandia, who under its contract retained discretion to terminate any Holmes & Narver employee. Defendant argues that, like TWA, it was attempting to implement the layoffs while negotiating between a contract and the federal antidiscminination laws. However, the evidence is clear that Sandia did exercise its discretion under the Holmes & Narver contract and did not designate the Plaintiffs for layoff. Rather, Sandia set forth their project requirements and the number of employees needed and instructed Holmes & Narver to make the layoff decisions. Sandia would have been amenable to work with several different Holmes & Narver contractors and did not exercise its contractual discretion to terminate Plaintiffs.

In addition, Defendant argues that the Plaintiffs were less qualified than the employees retained. This is directly contrary to ample evidence indicating that the Plaintiffs were among the most qualified of all the Holmes & Narver employees assigned to the Sandia contract. Defendant asserts that Plaintiff William Ramirez was not qualified to implement a HVAC system. However, Ramirez testifies that Defendant never raised the issue of the HVAC system to Ramirez to inquire whether he could handle such a project. Defendant argues that Plaintiff Angelo Rich was not qualified as a civil or structural engineer, however the evidence indicates that he had more years of experience and training in these fields than many of his coworkers. Finally, Defendant asserts

that Plaintff Jim Clifton was terminated because he refused to work overtime. However, Clifton testifies that Holmes & Narver had never requested that he work overtime, but if they had he would have been willing to do so.

Defendant next argues that the Plaintiffs' were terminated because their dismissal would be least disruptive. The evidence indicates that to the contrary, Plaintiffs had heavier work loads than several of their co-workers who were not laid off. Thus, their layoffs required their heavy workloads to be reassigned to other people, hardly mitigating any potential disruption. In addition, Sandia was accustomed to disruption in their projects and frequently shifted project teams around, creating even more disruption.

Finally, there is evidence to indicate that the layoff decisions were motivated by Plaintiffs' ages. The evidence shows that Defendant was aware that the layoffs created a pattern of discrimination, but recklessly chose to layoff the oldest and among the most qualified employees. Rita Shiplet, the local Human Resources Manager found a "disproportionately high number of people over 40 being let go." The corporate Human Resources manager testified that where patterns of discrimination occurred Holmes & Narver generally took corrective action. In this case no corrective action was taken after Shiplet consulted with the corporate Human Resources manager and the in-house counsel. In addition, the procedures of Holmes & Narver's own layoff policy were not followed to determine how serious the age problem was. The fact that Defendant terminated Plaintiffs after recognizing the ADEA implications, but acted without following their standard procedures offers further evidence of age discrimination. The most direct proof of willful age discrimination comes from Allen Nicholsen, the Holmes & Narver supervisor responsible for the layoffs who allegedly commented that the Plaintiffs were close to retirement

age and asserted that Plaintiffs could not sue Holmes & Narver nor do anything else about the lay offs. This assertion, if proved at trial, suggests that Defendant recognized the possible ADEA violation, but considered itself to be above the law.

Based upon the pretextual justifications for the layoffs, Defendant's awareness of the ADEA implications, the failure to take corrective action or follow corporate policy, and Nichelsen's comments of Plaintiff's proximity to retirement age, the Court finds that there is sufficient evidence to support a finding of willful age discrimination. The combination of these factors support Plaintiffs' claims that age was a predominant factor in their termination. Accordingly, Defendant's motion for summary judgement as to Plaintiffs claims for liquidated damages under the ADEA is denied.

**CONCLUSION**

The Court finds that Plaintiff Clifton has offered sufficient evidence to prove a retaliatory discharge claim. The Court further finds there is no genuine issue of material fact supporting Plaintiff Ramirez's and Plaintiff Rich's claims for retaliatory discharge. As to Defendant's Second Motion for Summary Judgment, the Court finds that Plaintiffs have offered sufficient facts in dispute to support a claim for liquidated damages under the ADEA. The Court finally finds that Plaintiffs are not entitled to compensatory or punitive damages under the ADEA or New Mexico Human Rights Act.

**WHEREFORE,**

**IT IS THEREFORE ORDERED**

(1)     Defendant's motion for Summary Judgment as to Plaintiffs' Claims for Retaliatory

Discharge **[Doc. No. 66]** is well taken in part and will be **GRANTED IN PART** as to Plaintiff Ramirez and Plaintiff Rich and **DENIED IN PART** as to Plaintiff Clifton;

(2)     Defendant's Motion for Summary Judgment As to Plaintiffs' Claims for Punitive Damages Under the ADEA and New Mexico Human Rights Act, Compensatory Damages Under the ADEA and Liquidated Damages Under the ADEA  **[Doc. No. 70]** is well taken in part and will be **GRANTED IN PART** as to Plaintiffs' Claim for Punitive and Compensatory Damages Under the ADEA and Punitive Damages Under the New Mexico Human Rights Act, and will be **DENIED IN PART** as to Plaintiffs' Claims for Liquidated Damages Under the ADEA.


**DATED**  this 20th day of April, 2000.

_____
MARTHA VÁZQUEZ
U. S. DISTRICT JUDGE

Attorneys for Plaintiffs:
Thomas Johnson
Kerri Peck

Attorneys for Defendant:
John Stiff
Susan Hapka